FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 25, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MICHELLE G.,[1]

              Plaintiff,

v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

              Defendant.

No.   4:21-cv-5006-EFS

**ORDER RULING ON CROSS
SUMMARY-JUDGMENT MOTIONS
AND DIRECTING ENTRY OF
JUDGMENT IN FAVOR OF
PLAINTIFF**

Plaintiff Michelle G. appeals the denial of benefits by the Administrative Law Judge (ALJ). Because the ALJ provided insufficient reasons for rejecting Plaintiff's symptom reports and failed to provide adequate analysis and explanation at steps one, four, and five of the sequential evaluation process, the Court grants summary judgment in favor of Plaintiff, denies the Commissioner's motion for summary judgment, reverses the decision of the ALJ, and remands this case for further proceedings.

---

[1] For privacy reasons, the Court refers to every social security plaintiff by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

## I.    Five-Step Disability Determination

A five-step sequential evaluation process is used to determine whether an adult claimant is disabled.[2]  Step one assesses whether the claimant is engaged in substantial gainful activity.[3]  If the claimant is engaged in substantial gainful activity, benefits are denied.[4]  If not, the disability evaluation proceeds to step two.[5]

Step two assesses whether the claimant has a medically severe impairment or combination of impairments that significantly limit the claimant's physical or mental ability to do basic work activities.[6]  If the claimant does not, benefits are denied.[7]  If the claimant does, the disability evaluation proceeds to step three.[8]

Step three compares the claimant's impairment or combination of impairments to several recognized by the Commissioner as so severe as to preclude substantial gainful activity.[9]  If an impairment or combination of impairments meets or equals one of the listed impairments (a "listing"), the claimant is

---

[2] 20 C.F.R. §§ 404.1520(a), 416.920(a).

[3] *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[4] *Id.* §§ 404.1520(b), 416.920(b).

[5] *Id.* §§ 404.1520(b), 416.920(b).

[6] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[7] *Id.* §§ 404.1520(c), 416.920(c).

[8] *Id.* §§ 404.1520(c), 416.920(c).

[9] *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

conclusively presumed to be disabled.[10]  If not, the disability evaluation proceeds to step four.

Step four assesses whether an impairment prevents the claimant from performing work she performed in the past by determining the claimant's residual functional capacity (RFC).[11]  If the claimant can perform past work, benefits are denied.[12]  If not, the disability evaluation proceeds to step five.

Step five, the final step, assesses whether the claimant can perform other substantial gainful work—work that exists in significant numbers in the national economy—considering the claimant's RFC, age, education, and work experience.[13]  If so, benefits are denied.  If not, benefits are granted.[14]

The claimant has the initial burden of establishing she is entitled to disability benefits under steps one through four.[15]  At step five, the burden shifts to the Commissioner to show the claimant is not entitled to benefits.[16]

---

[10] 20 C.F.R. §§ 404.1520(d), 416.920(d).

[11] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[12] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[13] *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Kail v. Heckler*, 722 F.2d 1496, 1497–98 (9th Cir. 1984).

[14] 20 C.F.R. §§ 404.1520(g), 416.920(g).

[15] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

[16] *Id.*

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 3

1

## II.    Factual and Procedural Summary

2

In November 2017, Plaintiff filed Title II and Title XVI applications for

3

disability benefits and supplemental security income.[17]  Plaintiff alleged an onset

4

date of July 15, 2006.[18]  She asserted disability based on posttraumatic stress

5

disorder (PTSD), anxiety, panic disorder, chronic depression, fibromyalgia, chronic

6

neck injury, a broken foot that was never treated, asthma, and chronic rib

7

fractures.[19]  Plaintiff's claims were denied initially and upon reconsideration.[20]

8

Plaintiff then requested an administrative hearing.

9

In March 2020, Administrative Law Judge Stewart Stallings presided over

10

the requested administrative hearing.[21]  Plaintiff and an impartial vocational

11

expert presented testimony at the hearing.[22]

12

In denying Plaintiff's disability claims, the ALJ found as follows:

13

- Insured Status — June 30, 2011, was Plaintiff's date last insured.[23]

14

15

16

---

17

[17] AR 20.

18

[18] AR 20.

19

[19] *See* AR 325.

20

[20] AR 20.

21

[21] AR 32.

22

[22] AR 41–86.

23

[23] AR 23.

- Step One — Plaintiff had not engaged in substantial gainful activity since July 15, 2006, the alleged onset date.[24]

- Step Two — Plaintiff had the following medically determinable severe impairments: cervical degenerative disc disease; cystocele and rectocele, status post-surgery; depression; anxiety; posttraumatic stress disorder; obesity; and lymphedema.[25]

- Step Three — Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.[26]

- RFC — Plaintiff had the RFC to perform sedentary work with the following alterations:
  - She can perform work involving "*frequent* lifting or carrying of small articles."[27]
  - She can work sitting for eight hours and standing/walking for two hours in an eight-hour workday.
  - She can only occasionally stoop and climb stairs and ramps.

---

[24] AR 23.

[25] AR 23.

[26] AR 23.

[27] AR 25 (emphasis added). *Cf.* 20 C.F.R. §§ 404.1567(a), 416.967(a) (each defining "sedentary work" to involve "*occasionally* lifting or carrying articles like docket files, ledgers, and small tools" (emphasis added)).

- She can never kneel, crouch, crawl, or climb ropes, ladders, or scaffolds.
- She can occasionally reach overhead.
- She should avoid all exposure to moving or dangerous machinery and unprotected heights.
- She should not perform production pace, conveyor belt-type work.
- She needs a predictable work setting.
- She can have no more than brief superficial contact with the public in person, but no limitation to phone contact.
- She can have occasional interaction with co-workers and supervisors.[28]

- Step Four — Plaintiff is capable of performing past relevant work as a customer service representative as actually and generally performed.[29]

- Step Five — Considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, including the following representative occupations: telemarketer, appointment clerk, and customer service representative II.[30]

The ALJ issued a written decision finding Plaintiff had not been under a disability as defined by the Social Security Act ("the Act") from July 15, 2006, through the date of the ALJ's decision, March 24, 2020.[31]  The Appeals Council

_____

[28] AR 25–26.

[29] AR 30–31.

[30] AR 31–32.

[31] AR 32.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

denied review.[32]  Plaintiff then appealed to this Court, primarily asserting that the ALJ improperly rejected her symptom reports and made contradictory findings at steps one, four, and five.[33]

### III.    Standard of Review

A district court's review of the Commissioner's final decision is limited.[34] The Commissioner's decision is set aside "only if it is not supported by substantial evidence or is based on legal error."[35]  Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[36]  Because it is the role of the ALJ and not the Court to weigh conflicting evidence, the Court upholds the ALJ's findings "if they are supported by inferences reasonably drawn from the record."[37]  The Court considers the entire record as a whole.[38]

---

[32] AR 1–6.

[33] *See generally*, ECF No. 16.

[34] 42 U.S.C. § 405(g).

[35] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

[36] *Id.* at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[37] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

[38] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole," not simply the evidence cited by the ALJ or the parties.) (cleaned up).

Further, the Court may not reverse an ALJ decision due to a harmless error.[39]  An error is harmless "where it is inconsequential to the ultimate nondisability determination."[40]  The party appealing the ALJ's decision generally bears the burden of establishing harm.[41]

## IV.    Analysis

On appeal, Plaintiff argues the ALJ erred by (1) improperly rejecting Plaintiff's symptom reports, (2) making "internally inconsistent findings at steps one and four," (3) improperly evaluating the medical opinion evidence, (4) failing to conduct an adequate listings analysis, and (5) failing to find Plaintiff disabled at step five.[42]  For the reasons discussed below, the Court holds the ALJ reversibly erred by failing to provide an adequate explanation for rejecting some of Plaintiff's testimony, as well as by making inconsistent and largely unexplained findings at steps one and four.  Remand is required because those errors impacted nearly every aspect of the ALJ's analysis, and the Court therefore need not address Plaintiff's remaining arguments.

## A.    Plaintiff's Symptom Reports: The ALJ reversibly erred.

Plaintiff argues that the ALJ failed to provide sufficient reasons for rejecting her symptom reports.  The Court agrees, at least as to Plaintiff's testimony

---

[39] *Molina*, 674 F.3d at 1111.

[40] *Id.* at 1115 (cleaned up).

[41] *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009).

[42] *See generally*, ECF No. 16.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 8

regarding the treatment recommendation that she elevate her legs three times daily for an hour at a time.

> 1. <u>Specific, clear, and convincing reasons were required to reject Plaintiff's symptom reports.</u>

The ALJ found Plaintiff's symptom reports "not persuasive."[43]  Because the record does not contain affirmative evidence of malingering, the ALJ was required to explain this finding and provide specific, clear, and convincing reasons supported by substantial evidence for rejecting Plaintiff's symptom reports after considering the relevant factors.[44]

> 2. <u>The ALJ improperly equated a lack of corroboration with inconsistency.</u>

As a preliminary matter, the ALJ's stated rationale suggests he at least partially conflated consistency of evidence with corroboration.[45]  The ALJ stated, "As for the claimant's statements about the intensity, persistence, and limiting

---

[43] AR 29.

[44] *See* 20 C.F.R. § 416.929(c); Social Security Ruling (SSR) 16-3p, *Titles II & XVI: Evaluation of Symptoms in Disability Claims*, 2016 WL 1119029; *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036).

[45] However, the ALJ went on to discuss certain perceived inconsistencies between Plaintiff's symptom reports and other evidence of record, which are discussed further below.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 9

effects of his or her symptoms, they are inconsistent *because* the objective medical evidence *does not support* the level of impairment claimed.  The claimant is alleging a complete inability to work, but her activities and the medical reports overall *do not indicate* that is the case."[46]

Contrary to the ALJ's stated reasoning, a claimant's symptom report is not rendered inconsistent merely because the record lacks corroborating medical evidence.  Indeed, although objective medical evidence—or the lack thereof—can certainly be a relevant factor in assessing the severity of a claimant's symptoms, an ALJ is not permitted to discount the claimant's symptom reports merely because they lack corroborating medical evidence.[47]  And if an ALJ believes there to be inconsistencies between a claimant's symptom reports and other evidence of record, general findings are insufficient; "rather, the ALJ must identify what testimony is

---

[46] AR 27 (emphasis added).  Plaintiff also argues that the ALJ erred by saying she alleged "a complete inability to work" when she was alleging only an inability to maintain gainful employment. ECF No. 16 at 3, 17.  The Court agrees that this phrase—though commonly used by ALJs—is an inaccurate summary of Plaintiff's claims. Regardless, the Court holds the error harmless; the ALJ accurately described Plaintiff's claims elsewhere in his decision, and Plaintiff has failed to show any effect on the ALJ's ultimate determination.

[47] *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008).

not credible and what evidence undermines the claimant's complaints."[48]  Thus, the
ALJ legally erred to the extent he found inconsistencies based solely on a lack of
supporting objective medical evidence.

> 3. <u>The ALJ failed to provide an adequate reason for rejecting Plaintiff's
> testimony regarding elevating her legs three times daily.</u>

At the administrative hearing, Plaintiff testified to having problems with
lymphedema and leg swelling.[49]  When was asked about treating her lymphedema
by elevating her legs, Plaintiff said, "it's been recommended at least three times a
day for at least an hour."[50]  She testified to engaging in other recommended
treatments as well, including using compression wraps, dieting, attending physical
therapy three times per week, and using a Flexitouch pump at home two hours a

---

[48] *Ghanim*, 763 F.3d at 1163 (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.
1996)); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring
that an ALJ sufficiently explain why he discounted the claimant's symptom
claims).

[49] For purposes of this order, the Court uses "lymphedema" to encompass the
symptoms of leg swelling and edema. *See, e.g.*, AR 2401 (assessing Plaintiff with
"[c]hronic venous insufficiency and secondary lymphedema with symptomatic
bilateral lower extremity swelling"); AR 4331 (noting Plaintiff's "bilateral lower
extremity swelling is mostly due to lymphedema"); AR 4349 (noting "improving
bilateral lower leg pitting edema and lymphedema").

[50] AR 65.

day.[51]  Still, Plaintiff stated, "those things were helping me kind of just keep it where it was,"[52] and she said that her lymphedema was worsening as of late.[53]

       a.    *The ALJ's Analysis*

In his written decision, the ALJ stated the following regarding Plaintiff's lymphedema and related symptom reports:

> In November 2017, it was noted the claimant had moderate edema of her legs and was told to wear compression socks and elevate her legs at night.  In November 2017, the claimant's leg swelling was attributed to her use of suboxone after surgery.  In December 2017, it was noted the claimant did not elevate her legs during the day.  In March 2018, it was noted the claimant was doing PT and wrapping her legs for her edema, and her leg swelling was much better. . . . In May 2018, the claimant reported her legs were doing better even though she had worked 9-hour shifts the last 2 days.  In June 2018, the claimant was discharged from PT with significant improvement in her lymphedema.  In May 2019, the claimant reported her lymphedema was worsening.  Her PT notes indicated she should wear compression stockings and lose weight.[54]

---

[51] According to a Flexitouch distributor's website, the device treats lymphedema and "works by sequentially inflating and deflating its chambers to create a gentle, wave-like motion that directs lymph fluid from the impaired area toward healthy regions of the body." *See* Tactile Medical, *How it Works*, *available at* https://tactilemedical.com/our-lymphedema-solutions/for-the-lower-body/flexitouch-plus/ (last accessed March 22, 2022).

[52] AR 49.

[53] AR 65.

[54] AR 27–28 (cleaned up).

From this, the ALJ incorrectly concluded, "The record does not support the claimant's report that she had to elevate her legs 3 times a day."[55]  But, not only does the record bely the ALJ's statement,[56] the ALJ also failed to provide any other clear and convincing reasons for rejecting this portion of Plaintiff's testimony.

### b.  *Evidence Tending to Support Plaintiff's Testimony*

Contrary to the ALJ's assertion, the record does indeed lend support to Plaintiff's testimony regarding being instructed to elevate her legs during the day. Starting in 2018, Plaintiff's doctors and physical therapists consistently recommended that Plaintiff elevate her legs "whenever possible."[57]  Upon conducting an initial examination and diagnosing Plaintiff with lymphedema in February 2020, Dr. Normanyo similarly opined that Plaintiff would need to "lie down and/or elevate legs during the day."[58]

The record's repeated and consistent written medical recommendations do not articulate a specific frequency or duration, but they are nonetheless consistent

---

[55] AR 28.

[56] By relying on a lack of "support," the ALJ again erroneously implied that Plaintiff's symptom reports could be disregarded solely based on a lack of corroborating evidence.

[57] *See, e.g.*, AR 4331 (June 2018); AR 4615 (May 2019); AR 4637 (June 2019); AR 4668 (Sept. 2019); AR 4701 (Dec. 2019).

[58] AR 4728.  Dr. Normanyo did not specify the frequency or duration at which Plaintiff would need to lie down and/or elevate her legs.

with—and lend support to—Plaintiff's testimony that medical providers advised her to elevate her legs three times a day for an hour.  The ALJ therefore erred in rejecting this testimony based on an alleged lack of support in the record.

              c.    *Plaintiff's Work Activities*

The ALJ also broadly rejected Plaintiff's symptom reports—not just regarding the leg-elevation testimony—based on Plaintiff's latest employment.  At the hearing, Plaintiff testified that in 2017 she was released after serving about 11 years in prison and immediately tried to obtain employment despite her medically determinable impairments.  Plaintiff was hired at a hobby-supply store but worked there only three days before having a severe panic attack and then requiring hernia repair surgery.[59]  Plaintiff then tried working at a large retail store, but she lasted only a couple of months.  She explained that she had problems with panic attacks at that job as well, but her primary reason for quitting was that the work enflamed her lymphedema.[60]

As to her most recent job, Plaintiff testified that as of the hearing date, she had been working "on and off for about a year" at a large online retailer.[61]  She worked at a call center, addressing customer questions and complaints via phone, email, and direct messaging.[62] But, Plaintiff said, she had not gone into work for

---

[59] AR 61; *see also* AR 334.

[60] AR 61–62.

[61] AR 46.

[62] AR 68–69, 74.

about three weeks because she was currently on unpaid medical leave.[63]  Plaintiff

testified that this was only the latest in a long line of leaves, accommodations, and

missed work, stating the following:

> I've had four medical leaves and two bereavement leaves and . . .
> mental health medical leave.  And, they have been extremely,
> extremely understanding and accommodating.  I have been paid
> for a significant portion of it, but I—and I've had three or four
> separate accommodations.  I think it's something that they're
> not feeling is something that can go on long term.  They've
> suggested to me, you know, I need to look at some other options,
> since I don't seem to be able to be there where I am supposed to
> be.[64]

Plaintiff explained that one of her bereavement leaves was for two weeks in

July 2019 after her son had died.  Thereafter, Plaintiff tried to return to work but

due to her mental-health issues she "was just not able to."[65]  However, she said, her

supervisors provided an accommodation that allowed her to work only two days a

week and which gave her flexibility to work more hours if she felt up to it.[66]

Plaintiff testified that she was able to continue her employment because "they're so

generous," noting, as an example, that the employer provided 20 hours of paid

personal time that she could use whenever she wanted.[67]  And—with such benefits

---

[63] AR 46–47, 50, 62–63.

[64] AR 46–47.

[65] AR 47.

[66] *See* AR 47.

[67] AR 47.

and accommodations in place—Plaintiff said that from July 2019 to the hearing date (February 2020), she "probably averaged about ten hours a week."[68]

### d. *The ALJ's Consideration of Plaintiff's Work Activity*

In analyzing Plaintiff's symptom reports, the ALJ provided the following analysis regarding Plaintiff's work activities:

> Although the claimant testified she only worked 10 hours a week after her son died, in August 2019, the claimant reported she had changed to 8-hour rather than 10-hour shifts and she had 2 days off a week.  In September 2019, the claimant reported working most of her hours.[69]
> . . .
> [T]he record reflects work activity rising at times to substantial gainful activity after the alleged onset date.  This indicates that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported."[70]

Although past work activities can serve as a legitimate reason for discounting symptom reports,[71] given Plaintiff's testimony, the ALJ's explanation does not suffice—especially as to Plaintiff's lymphedema symptom reports.

### i. **Caution is appropriate when discounting symptom reports based on prior work attempts.**

---

[68] AR 48.

[69] AR 27 (cleaned up).

[70] AR 28 (cleaned up).

[71] *See Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020); SSR 82-62 (S.S.A. 1982) ("Capacity to do past work may be indicative of the capacity to engage in SGA when that work experience constituted SGA and has current relevance considering duration and recency.").

As a general matter, an ALJ should take care when discounting a claimant's symptom reports based on prior employment that was short-lived and/or sporadic; "[w]here it is established that the claimant can hold a job for only a short period of time, the claimant is not capable of substantial gainful activity."[72]  "It does not follow from the fact that a claimant tried to work for a short period of time and, because of [her] impairments, *failed*, that [she] did not then experience [symptoms] severe enough to preclude [her] from *maintaining* substantial gainful employment."[73]  Rather, evidence that a claimant tried to work and failed will often support allegations of disabling symptoms.[74]  And attempts at work may be "especially convincing" where, as here, the claimant attempted work due to "extreme economic necessity," making "it at least as likely that the claimant tried to work in spite of [her] symptoms, not because they were less severe than alleged."[75]

Additional consideration is also appropriate when the prior employment at issue involved accommodations and/or paid leave.  Indeed, when assessing whether

---

[72] *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 694 (9th Cir. 1999).

[73] *Lingenfelter*, 504 F.3d at 1038.

[74] *See id.* (citing example cases).

[75] *See id.* at 1039.  *See also, e.g.*, AR 4454 (Nov. 2019: "She now recognizes she has to start working if she is ever going to get out of the debt she is presently under."); AR 4458 (Dec. 2019: "Money is a huge struggle for her so that has forced her to work even if she doesn't feel up to it.").

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 17

any of the claimant's prior work amounts to substantial gainful activity, ALJs are directed to consider any accommodations or special conditions benefitting the claimant.[76]  ALJs are forbidden from including in the claimant's "earnings" any amounts earned while on paid leave.[77]  ALJs are also forbidden from basing a finding of substantial gainful activity solely on the number of hours worked by the claimant.[78]

### ii. The ALJ's work-activity analysis does not suffice.

As mentioned above, the ALJ noted that "in August 2019, the claimant reported she had changed to 8-hour rather than 10-hour shifts and she had 2 days off a week.  In September 2019, the claimant reported working most of her hours."[79]  But, in using this as the basis to find Plaintiff engaged in work activity "rising at times to substantial gainful activity," it does not appear the ALJ gave

---

[76] *See* 20 C.F.R. §§ 404.1573(c), 416.973(c) ("If your work is done under special conditions, we may find that it does not show that you have the ability to do substantial gainful activity.").

[77] *See* 20 C.F.R. § 404.1574(2) ("When we decide whether your earnings show that you have done substantial gainful activity, we do not consider any income that is not directly related to your productivity.").

[78] *See* 20 C.F.R. § 404.1573(e) ("While the time you spend in work is important, we will not decide whether or not you are doing substantial gainful activity only on that basis.").

[79] AR 27.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 18

due consideration to the special conditions surrounding Plaintiff's employment. Consistent with the bulk of the record, Plaintiff testified that anything approaching full-time work was intermittent at best, and she retained her latest job only because her employer had been "extremely, extremely understanding and accommodating" and had allowed her to work minimal hours on a flexible schedule.[80]

Without more, the ALJ's reference to two treatment notes amongst the sizable record falls short of showing that Plaintiff's work efforts rose to the level of substantial gainful activity, much less that any of Plaintiff's symptom reports or testimony were inconsistent with the longitudinal record.[81]  The ALJ highlighted a single instance in which Plaintiff reported she "was able to get her hours changed;

---

[80] AR 46–47. *See also, e.g.*, AR 4449, 4454–56.

[81] *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (The ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid."); *Ghanim*, 763 F.3d at 1164 (emphasizing that treatment records must be viewed considering the overall diagnostic record); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (disallowing the ALJ from cherry picking evidence to support a conclusion that contradicts the overall diagnostic record).

. . . now she is working 8 hour shift[s] instead of 10 hours shifts."[82]  But that change was noted in early August 2019, less than a month after Plaintiff's son had died and less than two weeks after she failed her attempt to return to work.[83]  In mid-August 2019, Plaintiff reported that she "had [a] conversation with her supervisor at her work and feels like she has an improved relationship," and Plaintiff wanted to *start* working more hours—strongly suggesting that if she had ever worked on a fulltime schedule, she was no longer doing so by mid-August.[84]  It was not until September 2019 that—in the other treatment note cited by the ALJ— Plaintiff reported "working most of her hours."[85]  This strongly suggests that if Plaintiff ever did work on the eight-hour schedule, she did not do so for very long.

Indeed, Plaintiff testified to receiving several accommodations, including a variable and flexible schedule,[86] and the longitudinal record shows Plaintiff's hours varied significantly, and she continued to frequently miss work and fail to work as

---

[82] AR 4444 (Aug. 2019: also noting that Plaintiff "is struggling but she is going to work and not letting herself to give up which is what she feels drawn to do."). *See also* AR 27 (citing AR 4444).

[83] *See* AR 47–48.

[84] *See* AR 4445.

[85] AR 4447.

[86] AR 46–48; *see also* AR 4455 (Nov. 2019: "She has [the] ability to work fewer hours as an accommodation until January.")

many hours as were expected.[87]  Moreover, Plaintiff never suggested that there
were not periods during which she could work more hours than others.  Plaintiff
testified only that from July 2019 to the hearing date, which included unspecified
periods of leave, she estimated her overall *average* to be somewhere around ten
hours per week.[88]

The ALJ did not sufficiently explain how any of the evidence regarding
Plaintiff's work activities undermined any of her symptom testimony.[89]  Also, and
more specifically, the ALJ failed to explain how Plaintiff's latest employment—
which by all accounts allowed for greatly reduced hours and a flexible schedule—
was in any way inconsistent with Plaintiff's specific testimony that she was
instructed to elevate her legs three times daily.

---

[87] *See, e.g.*, AR 4449 (Sept. 2019); AR 4454 (Nov. 2019: "She now recognizes she has
to start working if she is ever going to get out of the debt she is presently under.");
AR 4455 (Nov. 2019: "She has [the] ability to work fewer hours as an
accommodation until January."); AR 4458 (Dec. 2019: "[Plaintiff] is back to working
more hours which is a good sign.  Money is a huge struggle for her so that has
forced her to work even if she doesn't feel up to it.  She is also hav[ing] more
medical problems associated with the stress she is experiencing."); AR 4456
(Jan. 2020: noting they discussed "how she still struggles going to work and often
misses days.").

[88] *See* AR 47–48.

[89] *See Ghanim*, 763 F.3d at 1163.

1

         *e.*    <u>*Plaintiff's Activities of Daily Living*</u>

2              If a claimant can spend a substantial part of the day engaged in pursuits

3 involving the performance of exertional or non-exertional functions, the ALJ may

4 find these activities inconsistent with the reported disabling symptoms.[90]

5 However, activities of daily living bear on a claimant's symptom reports only if the

6 level of activity is inconsistent with the individual's claimed limitations.[91]  Thus,

7 "the mere fact that a plaintiff has carried on certain daily activities, such as

8 grocery shopping, driving a car, *or* limited walking for exercise, does not in any way

9 detract from her credibility as to her overall disability."[92]

10            In his decision, the ALJ noted that Plaintiff "stated she can prepare simple

11 meals, do light house and yard work, do laundry, drive and shop, but being out in

12 public causes anxiety.  She stated she handles her finances, watches TV, spends

13 time with family, and attends NA meetings."[93]  The ALJ cited Plaintiff's daily

14 activities as another reason to discount her symptom reports, then going on to say,

15 "In addition, the claimant has described daily activities which are not limited to

16 the extent one would expect, given the complaints of disabling symptoms and

17

18

19

--------

20 [90] *Molina*, 674 F.3d at 1113.

21 [91] *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

22 [92] *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (emphasis added).

23 [93] AR 26.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 22

limitations.  The claimant takes care of her elderly father, including taking him to appointments."[94]

The ALJ failed to clearly explain convincing reasons why these reported activities are inconsistent with Plaintiff's reported limitations.[95]  Each activity could be performed within a relatively short period, at Plaintiff's own pace, on her own schedule, when her symptoms allowed, and without any oversight or performance expectations.[96]  Even more, the ALJ's analysis leaves out that although Plaintiff *initially* reported living with and assisting her father in 2017, she reported he was verbally abusive, and she had moved out by mid-2018.[97]  Plaintiff's activities of daily living do not amount to a specific, clear, and convincing

---

[94] AR 28 (cleaned up); *see also* AR 361, 369 (Plaintiff reporting helping care for her father while living with him, which involved checking to "make sure he's breathing," helping him with unspecified daily activities, sometimes making meals, taking him to medical appointments, and reminding him to take his medication).

[95] *See Ghanim*, 763 F.3d at 1163.

[96] *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons, and is not held to a minimum standard of performance, as she would be by an employer." (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

[97] *See, e.g.*, AR 49, 2400, 2432, 2469, 4336, 4444, 4514.

1    reason supported by substantial evidence for discounting any of Plaintiff's

2    symptom reports, let alone for rejecting her specific leg-elevation testimony.[98]

3         f.   _Improvement_

4         Arguably, the ALJ proffered improvement as another reason for discounting

5    Plaintiff's lymphedema symptom reports.  When evaluating symptom reports,

6    ALJs are directed to consider the effect that treatments have on a claimant's

7    symptoms.[99]  Additionally, the ALJ must "sufficiently consider the duration of, or

8    chronological fluctuation in, [the claimant]'s symptoms."[100]  Without more, general

9    references to improvement are insufficient to render repeatedly reported symptoms

10   "inconsistent" and therefore not credible.[101]  To undercut a claimant's credibility

11   and her disability claim, the improvement in question must be of the kind and

12   degree that brings her symptoms outside the Act's definition of disability.[102]  The

13

14

15

16   ───────────────

17   [98] _See Ghanim_, 763 F.3d at 1163.

18   [99] 20 C.F.R. § 416.929(c)(3)(iv)–(v); _id._ at § 404.1529(c)(3)(iv)–(v); _see Warre v._

19   _Comm'r of Soc. Sec. Admin._, 439 F.3d 1001, 1006 (9th Cir. 2006); _Tommasetti v._

20   _Astrue_, 533 F.3d 1035, 1040 (9th Cir. 2008).

21   [100] _Smith v. Kijakazi_, 14 F.4th 1108, 1112 (9th Cir. 2021).

22   [101] _See Ryan v. Comm'r of Soc. Sec._, 528 F.3d 1194, 1200–01 (9th Cir. 2008).

23   [102] _See id._; _Holohan v. Massanari_, 246 F.3d 1195, 1205 (9th Cir. 2001).

ultimate question is "whether the severity of the problem had decreased sufficiently to enable [her] to engage in gainful activity."[103]

Here, as the ALJ noted, Plaintiff's treatment providers sometimes noted improvement in her lymphedema. But, as the ALJ also noted, Plaintiff went on to report ongoing and worsening symptoms; the record is at best mixed regarding to what extent, and for how long, treatment improved Plaintiff's lymphedema symptoms.[104] And, in any event, Plaintiff's treating providers continued to recommend that Plaintiff elevate her legs as much as possible—often providing that recommendation in the very same treatment note reporting improvement of her lymphedema with treatment.[105] It would be unreasonable to interpret the noted instances of improvement as obviating the providers' ongoing treatment recommendations. Plaintiff's lymphedema sometimes improving to an unspecified degree therefore does amount to a clear and convincing reason supported by

---

[103] *See Warre*, 439 F.3d at 1006 (discussing the issue of medical improvement in the context of terminating benefits for a prior-established disability).

[104] *See* AR 28. *See also Ryan*, 528 F.3d at 1200–01.

[105] *See, e.g.*, AR 4331 (June 2018: Plaintiff reporting "that her leg swelling is much better with lymphedema manual massage and wrapping," and the attending DNP still recommending to "elevate legs whenever possible"); AR 4613 (May 2019: an ARNP noting that prior treatment was helpful but also suggesting that Plaintiff "elevate legs as often as possible").

1   substantial evidence for rejecting her testimony regarding the treatment

2   recommendation to elevate her legs for an hour three times a day.[106]

3                     g.    _Failure to Follow Recommended Treatment_

4          The ALJ discounted Plaintiff's symptom reports based on a finding that she

5   "has not been fully compliant with treatment recommendations."[107]   The ALJ

6   explained, "In October/November 2017, the claimant was drinking excessive

7   amounts of alcohol and smoking.   In August 2019, the claimant reported drinking

8   wine.   She was repeatedly told to lose weight and exercise, but she did not comply,

9   which led to aggravation of her symptoms."[108]

10         Yet, after her initial struggles with alcohol from late 2017 through early

11  2018,[109] the record shows Plaintiff largely abstained from alcohol. In the August

12  2019 note relied upon by the ALJ, Plaintiff reported having "about 2 glasses of

13  wine in [the] last week."[110]   The record also reflects that Plaintiff likely had good

14  reasons for not meeting the ALJ's expectations regarding exercise and weight loss.

15  For instance, in June 2018, Plaintiff's physical therapist noted that she had been

16

17  _____

18  [106] _See Ghanim_, 763 F.3d at 1163.

19  [107] AR 28.

20  [108] AR 28.

21  [109] _See_ AR 2400 (Mar. 2018: "She states she drinks Gin and Tonic daily for the last

22  2 months.").

23  [110] AR 4445.

referred to aquatic-exercise therapy because she was "unable to otherwise exercise."[111]

"[I]f the individual fails to follow *prescribed* treatment that might improve symptoms, [an ALJ] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."[112]  "A failure to follow treatment results in a denial of benefits only if the treatment is 'prescribed.'  Treatment that is merely recommended or suggested need not be followed."[113]  Even for prescribed treatments, ALJs are instructed to "not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment . . . ."[114]  An ALJ is required to "explain how [he] considered the individual's reasons in [his] evaluation of the individual's symptoms."[115]  Here, the recommended lifestyle modifications referenced by the ALJ were not prescribed, and the ALJ did not explain how he considered potential reasons Plaintiff had for not successfully executing such recommendations.

---

[111] AR 4336.

[112] SSR 16-3p (emphasis added).

[113] Frank S. Bloch, *Bloch on Social Security* § 3.43 (May 2011).

[114] SSR 16-3p.

[115] *Id.*

4.  <u>The ALJ's errors are consequential.</u>

The ALJ failed to provide any specific, clear, and convincing reasons supported by substantial evidence for rejecting Plaintiff's testimony regarding medical providers' instructions to elevate her legs three times a day for an hour at a time.[116]  The ALJ's errors are consequential, as the vocational expert's testimony established that Plaintiff would have necessarily been found disabled had her RFC included the corresponding limitation.[117]

**B.  Steps Four & Five: Plaintiff establishes consequential error.**

On appeal, Plaintiff argues that because the ALJ found at step one that she had not engaged in substantial gainful activity since the alleged onset date, "the ALJ directly contradicted himself" at step four by then finding that Plaintiff could perform past relevant work as a customer service representative.[118]  The Court agrees.

1.  <u>The ALJ reversibly erred by finding Plaintiff's work as a customer service representative qualified as past relevant work.</u>

At step one, the ALJ's analysis shows an implied distinction between Plaintiff's earlier employment attempts and her latest employment as a customer service representative, noting that Plaintiff's latest job "appears to be *ongoing* and

---

[116] *See Ghanim*, 763 F.3d at 1163.

[117] *See* AR 81–82.

[118] ECF No. 16 at 3.

likely not an unsuccessful work attempt."[119]  The ALJ's distinction is reasonable, as Plaintiff testified that although she was on medical leave at the time of the hearing, she was still employed with the same large online retailer.[120] Additionally, as to the same job, the ALJ later found that "the record reflects work activity rising *at times* to substantial gainful activity after the alleged onset date."[121]  But the ALJ provided barely any analysis regarding the extent and nature of Plaintiff's recent work activity or whether it amounted to substantial gainful activity.[122]  Despite both the record and Plaintiff's testimony indicating that she was frequently on leave and not working, the ALJ made no attempt to determine the timing or duration of such non-work periods.[123]  Instead, the ALJ

---

[119] AR 23 (emphasis added).

[120] *See* AR 46–47, 50, 62–63.

[121] AR 28 (emphasis added). *See also id.* ("This indicates that the claimant's daily activities have, *at least at times*, been somewhat greater than the claimant has generally reported." (emphasis added)).

[122] *Cf.* 20 C.F.R. § 404.1574a(c) (requiring separate analysis for each period of work if there was "significant change in [the claimant's] work pattern or earnings").

[123] *Cf.* 20 C.F.R. § 404.1574(c)(2) (requiring consideration of any "significant break in the continuity of [a claimant's] work," including consideration of periods where the claimant stopped working or reduced her work and earnings); *id.* (considering prior work to be "discontinued" if "out of work at least 30 consecutive days" or if "forced to change to another type of work").

1    decided step one in Plaintiff's favor, but he qualified that decision.  The ALJ said,

2    "Her work for [the large online retailer] appears to be ongoing and likely not an

3    unsuccessful work attempt, *but for the purposes of this decision*, the undersigned

4    finds that the claimant has not engaged in substantial gainful activity during any

5    time at issue."[124]

6        Regardless of the distinction and qualification made by the ALJ at step one,

7    he expressly found that Plaintiff "has not engaged in substantial gainful activity

8    since July 15, 2006, the alleged onset date."[125]  Because Plaintiff's latest job did not

9    start until well after July 2006, the ALJ's step-one finding necessarily means that

10   Plaintiff's customer-service-representative job did not qualify as substantial gainful

11   activity.  By definition, only substantial gainful activity can qualify as past

12   relevant work.[126]  Thus, the ALJ erred at step four by finding Plaintiff's job as a

13   customer service representative constituted past relevant work.[127]

14

15

16

17    _____

18   [124] AR 23 (emphasis added).

19   [125] AR 23.

20   [126] 20 C.F.R. § 404.1560(b)(1) ("Past relevant work is work that you have done

21   within the past 15 years, *that was substantial gainful activity*, and that lasted long

22   enough for you to learn to do it." (emphasis added)).

23   [127] *See* AR 30.

1

2

  2. <u>There are questions as to whether Plaintiff would be found disabled</u>

    <u>under Medical-Vocational Rule 201.12 at step five.</u>

3

  An ALJ may meet his step-five burden either "(1) by the testimony of a

4

vocational expert, or (2) by reference to the Medical–Vocational Guidelines."[128]  The

5

Medical-Vocational Guidelines, or "the grids," are a "short-hand method for

6

determining the availability and numbers of suitable jobs for a claimant."[129]  Based

7

on a claimant's RFC, age, education, and work experience, the grids set forth

8

whether the claimant is "disabled" or "not disabled."  If a claimant suffers from

9

both exertional and non-exertional limitations, the ALJ must consult the grids

10

first, before otherwise assessing whether the claimant is capable of engaging in

11

substantial gainful work.[130]  Where application of the grids directs a finding of

12

disability, the ALJ must accept that finding.[131]

13

  Plaintiff argues that if her job as a customer service representative "is

14

properly excluded from past relevant work, she is determined disabled pursuant to

15

Medical-Vocational Rule 201.12 as of her 50th birthday in November 2017 for SSI

16

purposes."[132]  The Court agrees that the ALJ's step-one finding precluded the ALJ

17

18

[128] *Maxwell v. Saul*, 971 F.3d 1128, 1130–31 (9th Cir. 2020) (quoting *Tackett*, 180

19

F.3d at 1099.).

20

[129] *Id.*

21

[130] *Id.*

22

[131] *Id.* (quoting *Cooper v. Sullivan*, 880 F.2d 1152, 1157 (9th Cir. 1989)).

23

[132] ECF No. 16 at 3.

from treating Plaintiff's customer-service-representative job as past relevant work. That said, whether Plaintiff would be found disabled under Medical-Vocational Rule 201.12, as she suggests, depends on whether she acquired any transferable skills.[133]

Generally, transferability of skills becomes an issue only when the claimant's impairments prevent the performance of past relevant work that was found to be skilled or semiskilled.[134] Here, however, Plaintiff testified that worked as a customer service representative "on and off for about a year" with the same employer.[135] The Dictionary of Occupational Titles states that it takes "[o]ver 3 months up to and including 6 months" to learn the skills of a customer service representative.[136]

---

[133] *Compare* 20 C.F.R. § Pt. 404, Subpt. P, App. 2 ("Grids"), Rule 201.12, *with id.* Rule 201.00(e) ("The presence of acquired skills that are readily transferable to a significant range of skilled work within an individual's residual functional capacity would ordinarily warrant a finding of ability to engage in substantial gainful activity regardless of the adversity of age . . . .").

[134] SSR 82-41, *Titles II & XVI: Work Skills & Their Transferability*, § 1, 1982 WL 31389.

[135] AR 46.

[136] *See* DICOT 249.362-026.

1

2

3

4

5

6

The ALJ found Plaintiff's employment lasted long enough to learn and provide average performance.[137]  The ALJ observed that "[t]he vocational expert also testified the claimant has transferable skills to other sedentary jobs."[138]  But the ALJ did not provide any analysis or explanation regarding when and to what extent Plaintiff was engaged in customer-service-representative work or whether such work activity was sufficient to acquire the related skills.

7

8

9

10

11

12

13

> When the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision. Findings should be supported with appropriate documentation.
>
> When a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the . . . ALJ's decision. . . . It is important that these findings be made at all levels of adjudication to clearly establish the basis for the determination or decision for the claimant and for a reviewing body including a Federal district court.[139]

14

15

16

The ALJ's lack of analysis leaves several questions remaining regarding whether Plaintiff had any transferable skills.  The ALJ's finding therefore lacks the requisite supporting substantial evidence.[140]

17

_____

18

[137] *See* AR 30.

19

[138] AR 31.

20

21

22

[139] SSR 82-41 § 6. *See also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("[S]pecific findings on transferable skills are necessary even where the ALJ relies on the testimony of a [vocational expert].").

23

[140] *See Hill*, 698 F.3d at 1158.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 33

1

     3.  <u>The ALJ's errors are consequential.</u>

2

     The ALJ's errors at steps four and five are consequential because if Plaintiff

3

were found to lack any transferable skills, she would have been found disabled

4

under Medical-Vocational Rule 201.12 as of her 50th birthday. In light of the

5

conflict between the ALJ's step one and step four findings, and the lack of analysis

6

and explanation at those same steps, remand is required for the ALJ to reconduct

7

the sequential disability evaluation starting at step one.[141]

8

### V.    CONCLUSION

9

     The Court reverses the decision of the ALJ. Because the Court finds the

10

record does not clearly establish that Plaintiff is entitled to benefits, the Court

11

remands this case for further proceedings pursuant to sentence four of 42 U.S.C.

12

§ 405(g).[142]

13

14

_____

15

[141] *Cf. Bray*, 554 F.3d at 1236 n. 12 ("Although the ALJ characterized [the

16

claimant]'s five plus months of grocery clerk employment as an "unsuccessful work

17

attempt," . . . a typical worker could 'learn the techniques and develop the facility

18

needed for average performance' in that job after one to three months.").

19

[142] *See Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke v. Barnhart*,

20

379 F.3d 587, 595 (9th Cir. 2004) ("[T]he proper course, except in rare

21

circumstances, is to remand to the agency for additional investigation or

22

explanation."); *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone*

23

*v. Heckler*, 761 F.2d 530 (9th Cir. 1985)).

On remand, the Commissioner shall instruct the ALJ to conduct the five-step sequential evaluation process anew, starting with step one. In doing so, the ALJ shall be sure to include specific, detailed, and supported findings regarding (1) Plaintiff's symptom reports, particularly Plaintiff's testimony that her medical providers recommended she treat her medically determinable impairment of lymphedema by elevating her legs three times per day for an hour at a time; (2) the nature, duration, and timing of any of Plaintiff's relevant work activities, including any changes in work hours or responsibilities; and (3) what transferable skills, if any, Plaintiff possesses, including how and when such skills were acquired.

Accordingly, **IT IS HEREBY ORDERED**:

1.    Plaintiff's Motion for Summary Judgment, **ECF No. 16**, is **GRANTED**.

2.    The Commissioner's Motion for Summary Judgment, **ECF No. 20**, is **DENIED.**

3.    The decision of the ALJ is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this order.

4.    The Clerk's Office shall enter **JUDGMENT** in favor of Plaintiff.

5.    The case shall be **CLOSED**.

**IT IS SO ORDERED.** The Clerk's Office is directed to file this Order and provide copies to all counsel.

**DATED** this 25th day of March 2022.

                    s/Edward F. Shea
                    EDWARD F. SHEA
            Senior United States District Judge